# HISEL v. STATE.

No. A-11850.  Nov. 25, 1953.

(264 P. 2d 375.)

Charles E. Dierker and Herman Merson, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, Edd Hisel, was charged by an information filed in the district court of Oklahoma county, along with Charles A. Litton and Grover Pendleton, with violating the terms and provisions of Title 69 O.S. 1941 § 323, as amended by House Bill No. 116 of the Session Laws of Oklahoma, 1951, in that "the defendants and each of them did purchase for and on behalf of Oklahoma county from the Metropolitan Paving Company asphaltic concrete in the total amount of $6,846.28, without having first advertised and considered bids for such asphaltic concrete, and the said asphaltic concrete so purchased was used for the purpose of constructing, reconstructing, and repairing of a county highway in Oklahoma county known as Sooner Road." The defendant Edd Hisel and Charles A. Litton each demanded an immediate trial, a jury was waived and the cause was heard before the Honorable Floyd L. Jackson, assigned judge, who found each of the defendants guilty as charged in the information and assessed a fine of $100 and declared their offices vacated as a result of such conviction.

From this conviction the defendant Hisel has appealed and presented four propositions for reversal of the case in his brief, to wit:

(1) The court erred in finding defendant guilty.

(2) The statute under which the prosecution was maintained is so vague, indefinite, uncertain and duplicitous as to be unconstitutional and void.

(3) That after the statute in question was amended in 1951 there were no penalty provisions in force and effect at the time of the commission of the acts alleged by the State to have been in violation of Section 323, Title 69 O.S. 1941, as amended in 1951.

(4) The evidence showed that the disbursements of the funds of Oklahoma County were made in connection with repairs on a county highway and that the same embraced labor, material, transportation and the use of machinery and that such uses were not prohibited by the statute involved.

As we view the case, assignments of error one, two and four are so closely connected that they should be considered together.

The undisputed evidence disclosed that a county highway in the vicinity of Tinker Field known as Sooner Road had for some months prior to July 1, 1951, handled a great volume of traffic and the road had gotten to be in very bad condition; that this road was embraced in county commissioner's district No. 2, from which the defendant Hisel was elected; that many complaints were made to Mr. Hisel concerning the bad condition of the road and demands were made for its repair; that a considerable amount of patching by placing gravel and other material on the road, of an emergency nature, was done and after this was completed, it was determined in order to preserve the road that a new layer

of asphaltic concrete of approximately one-half mile distance should be laid; that on November 22, 1950, the board of county commissioners of Oklahoma county had advertised for bids to be received for material to be furnished to the county commissioners for a six months period for highway purposes in accordance with the specifications named in the notice. That pursuant to the advertisement for bids a bid was received from the Metropolitan Paving Company for asphaltic concrete and a contract was made on November 22, 1950, with said company and the prices of said asphaltic concrete were set out in the contract.

The disputed evidence revolves around the time that the patchwork was done and the contract for the resurfacing work made. C. W. McFerron, county engineer, R. D. Neal, road superintendent for commissioners' District No. 2, and H. H. Herring, an employee in District No. 2, all testified that the patchwork was done in August 1951, and Neal and McFerron testified that the decision to resurface the road by laying asphaltic concrete on it was made after the patchwork was done for the purpose of preserving the road. Neal testified that this decision was made between the defendant Hisel, himself, and McFerron. McFerron testified that it was determined that resurfacing should be done after the emergency patchwork on the road was completed and that this was about two or three days before the actual delivery of the asphaltic concrete by the Metropolitan Paving Company.

Contradictory to this testimony was that of the defendant Hisel, who stated that after the condition of the Sooner Road and other roads in the immediate area of Tinker Field was called to his attention, that he contacted the Metropolitan Paving Company and asked them to immediately deliver sufficient asphaltic concrete, delivered hot to be rolled on the highway for the purpose of putting the road in a state of repair, and was advised by Ed Kavanaugh in June, 1951, before the end of the fiscal year, that the company could not do the job immediately because of the rush of work that they were doing, but that nevertheless, even though the work could not be reached before the end of the fiscal year, they would perform the work in accordance with the terms of the written contract then in force and effect.

It was undisputed that the Metropolitan Paving Company, during the latter part of August, 1951, did deliver asphaltic concrete laid in place on the Sooner Road and that immediately after the work was completed and about September 10, 1951, A. W. Kavanaugh, president of the Metropolitan Paving Company, came to the office of the county engineer of Oklahoma county and presented two claims calling for the payment of the total amount of $6,846.28 for the delivery of the asphaltic concrete laid in place on the Sooner Road. One of these claims was for $1,563 for 130.25 tons of asphaltic concrete laid in place by hand labor at $12 per ton and the other claim was for $5,283.40 for 657.14 tons of asphaltic concrete at $8.04 a ton laid in place on the Sooner Road by machinery.

The said Kavanaugh was advised at that time by Jesse Johnson in the county engineer's office that the claims would have to be revised and presented so that each claim would be less than $1,000 and accordingly the claims were redrawn in the county engineer's office, and as redrawn they constituted eight in number, the smallest being for the sum of $526.94 and the largest being for $989.36. That the defendant Hisel issued purchase orders covering the exact amount of these individual claims and the purchase orders were duly certified by the county clerk of Oklahoma county as being within the unencumbered balance to the credit of the appropriation for highway purposes. That on September 20, 1951, these claims were duly approved by a unanimous vote of the board of county commissioners and warrants were issued and paid out of the appropriation for the fiscal year 1951-52.

At the conclusion of the hearing the trial judge gave a lengthy statement in which he summarized his conclusions as to the facts and the law of the case. In his summary he found that the patchwork on the road was done after the commencement of the fiscal year July 1, 1952, and that the negotiation with the Metropolitan Paving Company for the delivery of asphaltic concrete was made thereafter and at a period of time when the written contract of November 22, 1950, had expired by its terms. That the purported agreement between Commissioner Hisel and the paving company on the price of the asphaltic concrete delivered in place on the Sooner Road, as testified to by Hisel, was not binding upon the county because one commissioner could not validly make a contract without the approval of the other two commissioners, and that accordingly, if an effort had been made in June, 1951, to extend the written contract with the Metropolitan Paving Company, such would have been invalid and of no effect because it was never done by a majority of the board of county commissioners duly sitting at their office for such purpose.

The trial court correctly held that no agreement between the defendant Hisel and the paving company would be binding upon the county because one commissioner could not validly make a contract without the approval of the other commissioners. In Western Paint and Chemical Company v. Board of Commissioners of Garfield County, 161 Okla. 300, 18 P. 2d 888, it was held:

"The statutes provide for a board of county commissioners, provide for the time and place of the meetings of such board, how the board shall transact business, and the record that shall be kept of its transactions. Under those statutes, a county can be bound upon a contract by the board of county commissioners only where the action taken by the board of county commissioners was in a session of the board of county commissioners."

There are many other cases cited in that opinion which sustain the rule that an agreement with one of the county commissioners in the absence of the others does not bind the county. In this connection, there is no evidence that the commissioners as a board ever undertook to extend the contract which had been made with the Metropolitan Paving Company on November 22, 1950. We do not infer that the commissioners could have validly extended the contract over into another fiscal year without a new notice to bidders being extended. However, such is the argument of the defendant, but since the trial court found that the contract for the delivery of the asphaltic concrete was made by only one commissioner and then it was done after the beginning of the fiscal year, and the evidence abundantly supports his finding, we uphold his ruling in that regard.

In Thompson v. Board of Commissioners of Ottawa County, 201 Okla. 405, 206 P. 2d 222, 223, the Supreme Court held:

"The requirement for a valid and binding contract between any person and the board of county commissioners affecting funds in the county highway fund are: First, an appropriation must have been made by the board of county commissioners, and approved by the excise board of said county making an appropriation for the kind of work or material sought to be covered in said contract; second, the record in the county clerk's office must show an unexpended and unencumbered balance in said appropriation equal to or more than the amount of the contract sought to be made; third, the contract or purchase order must be signed and certified to by the county clerk certifying that there is an unexpended balance in said appropriated fund sufficient to pay the amount of said contract."

If it should be contended that there was a valid agreement made in June, 1951, by the paving company, wherein they orally agreed to perform the work on the Sooner Road on the basis of its contract of November 22, 1950, the condition of the 1950-51 fiscal year appropriation would have to be determined to see whether said contract was valid. Under the decision in the above case there would have

been no valid and binding contract because the provision of the statute, 62 O.S. 1941 § 311, was not complied with in that the county clerk did not certify on a contract or purchase order in June, 1951, that there was an unencumbered balance in the appropriation for road purposes sufficient to pay the amount of said contract. The defendant himself did not attempt to have the alleged contract and the claims filed thereunder paid out of the 1950-51 fiscal year appropriation for highway purposes, but in the purchase order signed by the defendant and certified by the county clerk on September 10, 1951, it was certified that there was an unencumbered balance in the appropriation for highway purposes sufficient to pay the amounts of each of the purchase orders which were issued. Although the facts established that an employee of the county in the engineer's office suggested that the two claims presented by the paving company should be broken down into eight separate claims so that the amount of each claim would be under $1,000, the defendant testified that he had no knowledge that this was done. However, to refute this testimony of the defendant, we have the testimony of his knowledge that the work was being performed at the time it was done; and the eight purchase orders signed by the defendant, which formed the basis for the payment of the claims to the paving company, showed on their face the dates that the ashpaltic concrete was delivered to the Sooner Road because attached to each purchase order were the weight tickets showing the date of the deliveries to the Sooner Road, and these weight tickets show the deliveries being made on August 24th and 26th. In the face of this record it is almost incredible to believe that the defendant did not know that the two claims presented by the paving company had been divided into several smaller claims so that the amount of each claim was less than $1,000. We rather choose to believe that the defendant acted in good faith in the belief that the splitting of the claims, such as was done, was a perfectly legal way to handle the transaction. In the letter to the county attorney demanding an immediate trial signed by the defendant and his codefendant, Charles A. Litton, of June 12, 1952, they stated:

"You know that the procedure followed by us was the same procedure as used by prior boards of county commissioners and other officials in this county for at least the past 35 years. You further know that this procedure is generally accepted as being proper and is used by other county officials all over the State of Oklahoma."

It should be noted there was no charge that the defendant and his codefendants acted corruptly or profited by the transaction. On the contrary, the undisputed evidence was that the county benefited from the purchase which was made. The purchase was made in accordance with the terms of a contract entered into in November, 1950. Although the contract had expired by its terms and could not lawfully be extended without a new advertisement for bids, the proof shows without dispute that commissioner Hisel prevailed upon the paving company to deliver the asphaltic concrete rolled in place at the November, 1950, price at a time when the price of asphaltic concrete had risen from the price at which it was quoted in November, 1950. This prosecution must stand or fall upon the technical proposition that the commissioners in their contract for the delivery of asphaltic concrete to be rolled in place did not follow the terms of the statute named in the information.

With the above conclusions established, it then becomes necessary to closely examine the statute under which the prosecution was instituted to see whether such acts constituted a violation of the statute. The statute in question provides:

"When any culvert or bridge is to be constructed, or grade-and-drainage project is to be developed, or reconstruction or replacement or major repairs to be accomplished, in either event, where engineer's plans and specifications are required by law to assure conformity to statutory minimum restrictions or by the

State or Federal Departments of Highways when such developments are in co-operation with either or both of them, and the engineer's total estimated cost for material and construction is Two Thousand Five Hundred Dollars ($2,500.00) or more, it shall be advertised and let at a public letting, at a cost not to exceed the engineer's estimate; but, if the bids can be wisely rejected, and such construction work can be completed for a cost below or equal to the engineer's estimate or below any bid submitted at a public letting and so entered in their Journal, nothing in this Act contained shall prevent the Board of County Commissioners of any county from causing the same to be built by day labor (force account) and purchase by the county of materials in the manner hereinafter provided.

"After any Board of County Commissioners determine to reject bids and thereafter to purchase materials and to construct, reconstruct, or repair by day labor as aforesaid, and also where there is necessity for its use on county highways or any part of the county highway system, or for stockpile or warehouse to be used as needed for day-to-day maintenance, and where it can be bought to an advantage, nothing in this Section shall be construed to prevent the purchase, without advertisement, of crushed rock, gravel, sand, cement, steel, lumber or other materials for said county highways or highway system commonly bought in bulk, provided the total cost of any one such item or any one such class of material involved in any one purchase is less than One Thousand Dollars ($1,000.00.) Moreover, be it further provided that each Board of County Commissioners is hereby authorized, for the purposes stated in this paragraph, to advertise and on the date named in such published notice consider bids on specified class, grade, sizes, and any other designated specification, named and stated in such notice, which bids may specify unit rates at which delivery thereof may be had 'when and as needed' within but not beyond the current six (6) months period nor beyond the term of office of such Board; and thereafter, having entered all such bids in their Journal and indicated the best responsible bids in said Journal, purchases may be made, as needed, in accordance with the best responsible bids so entered, in any amount and all requisitions to such best responsible bidder within such period for materials of the kind, class and character named in the Journal as awarded to him, shall be deemed to be within the authority granted by this Act. * * *" 69 O.S. 1951 § 323, effective April 9, 1951.

The trial court found that under the evidence the defendant was guilty of violating both the first provision which provided for advertising and a public letting where the amount involved was $2,500 or more, and the second paragraph of the statute providing for the purchase of materials without advertisement where the amount in any one purchase is less than $1,000. The court erred in concluding that the defendant violated the first provision of this statute. This provision of the statute is directed at the following: (1) construction of bridge or culvert, or (2) development of a grade-and-drainage project, or (3) reconstruction, or (4) replacement, or (5) major repairs to be accomplished.

The statute further provides *in either of these events* the facts must be affirmatively established that engineer's plans and specifications were required by law to assure conformity to statutory minimum restrictions or by the State or Federal Department of Highways when such developments are in co-operation with either or both of them and the engineer's estimate of the cost was $2,500 or more (it shall be advertised, etc.). In this case there is a total absence of evidence of any engineer's estimate of cost or that any engineer's plans and specifications were prepared or were necessary to conform to certain requirements. The proof could not sustain a conviction under this section of the statute and we do not believe it was the intention of the prosecution to attempt to maintain the action under this subdivision of the statute.

Obviously, from the manner in which the claims were handled, the defendant and all other parties concerned thought that the purchase of the asphaltic concrete laid in place came within the provisions of the second subdivision of the above statute, which authorized the purchase without advertisement of certain materials

when the amount involved in any one purchase was less than $1,000. That could have been the only purpose in splitting the claims into amounts of less than $1,000 each. However, even though the commissioners thought the purchase came within the terms of this section of the statute, still if it did not do so, the prosecution must fail.

A consideration of the history of Section 323, supra, is enlightening as to the purpose of such legislation and the evils at which it was directed. This statute first appeared in 1915 in an extensive law dealing with the highway department, Chapter 173, Session Laws 1915. This original act was not so ambiguous as the present one and was definite and certain concerning the advertisement for bids for repair work and materials where the cost exceeded $200. Section 8 of said act which, as amended, now appears as Section 323 of the 1951 statutes provided:

"All culverts and bridges constructed, tile and tiling and repair work or material therefor, of which the engineer's estimated cost shall be two hundred ($200.00) dollars or less, may be advertised and let at a public letting, at a cost not to exceed the engineer's estimate, or may be built by day labor or by force account. Provided, that where there is a necessity for its use on the road, and it can be bought at an advantage in carload lots, nothing in this section shall be construed to prevent the purchase, without advertisement, in carload lots, of crushed rock, gravel, sand, cement, steel, lumber, or other materials for use on said roads. All culverts and bridge construction tile and tiling and repair work or materials therefor, of which the engineer's estimated cost shall exceed two hundred ($200.00) dollars, shall be advertised and let at public letting to the lowest and best bidder * * *."

The section was later amended by Section 4, Chapter 30, Session Laws 1916. The statute as thus amended appears in the 1941 Code as Title 69 § 323. As thus written it provides:

"When any culvert or bridge is to be constructed, or piece of tiling or repair work is to be done, or material for any of them is to be purchased, when the engineer's total estimated cost for material and construction is five hundred dollars ($500.00) or more, it shall be advertised and let at a public letting, at a cost not to exceed the engineer's estimate, or it may be built by day labor if the bids can be wisely rejected.

"Where there is a necessity for its use on the road and it can be bought to an advantage, nothing in this Section shall be construed to prevent the purchase without advertisement, of crushed rock, gravel, sand, cement, steel, lumber or other materials for said road commonly bought in bulk, provided the total cost of any one such item is less than two hundred dollars ($200.00).

"In letting a contract, the board shall award to the lowest or best bidder and shall have the power to reject any or all bids, in which event they may readvertise or build by day labor at a cost not to exceed the lowest responsible bid received. * * *"

An analysis of the section of the statute relied upon for conviction will disclose the legislative intent which must govern in our interpretation of the statute. The section starts with this phrase:

"After any Board of County Commissioners determine to reject bids * * *"

This obviously refers to the bids which were necessary in the construction and development of the projects named in the first paragraph where the engineer's estimated cost was $2,500 or more.

"and thereafter to purchase materials and to construct, reconstruct, or repair by day labor as aforesaid * *"

This could only mean the construction and reconstruction and repair mentioned in the first paragraph, as the statute to this point relates entirely to the matters and things mentioned in the first paragraph of the statute.

"and also where there is necessity for its use on county highways or any part of the county highway system, or for stockpile or warehouse to be used as needed for day-to-day maintenance * * *"

At this point in the statute, there is inserted matter not contained in the first paragraph of the statute, and for the first time in this statute, appears authorization for the purchase of certain materials hereinafter to be designated for stockpiling and where there is a necessity for its use which probably indicates that the commissioners could proceed under this section in an emergency under the other conditions named.

"and where it can be bought to an advantage * * *"

This would indicate a price not greater than would be obtainable after public letting with a full consideration of all elements involved, including the emergency nature of any work that might have to be undertaken.

"nothing in this Section shall be construed to prevent the purchase, without advertisement * * *"

This is a negative statement authorizing the purchase without advertisement, but nowhere is there an affirmative statement directing that the purchase of certain materials exceeding $1,000 should be made after advertisement and notice to bidders. This positive directive concerning advertisement for bids appears in the original 1915 Act hereinabove quoted, but either intentionally or through oversight was omitted entirely in this 1951 Act, under which the prosecution was maintained.

"of crushed rock, gravel, sand, cement, steel, lumber or *other materials* for said county highways or highway system *commonly bought in bulk* * * *"

It would seem from the wording of this part of the statute that the commissioners would be allowed to stockpile certain essential items used on their highway system which could be bought in bulk and stored in stockpiles or warehouses to be used as needed for upkeep and maintenance of the county roads.

"provided the total cost of any one such item or any one such class of material involved in any one purchase is less than One Thousand Dollars ($1,000.00)."

This puts a limitation on the county commissioners in the amount of material that might be purchased at any one time. Certainly, under this provision, splitting of single purchases involving over $1,000 into smaller claims of less than $1,000 would be condemned.

Then follows an additional phrase in this same paragraph of the statute which authorizes the purchase of materials of the kind, class and character named in a public notice to bidders, which contract would provide for the delivery of such materials upon demand at any time "within but not beyond the current six (6) months period nor beyond the term of office of such Board." This grant of a disecretionary power to make a contract for the purchase of materials at a unit rate is not involved in this proceeding. Although the contract of November 22, 1950, was apparently in accordance with this provision of the statute the contract was made several months before the statute was passed and at a time when there was no legal provision for such procedure.

The difficulty as we view this 1951 legislative enactment is that the Legislature, in the second paragraph of the statute involved, assumed that there was a valid

law in existence requiring the board of county commissioners to advertise for bids in connection with the reconstruction or repair of the county highway system. However, no such law existed unless it was by the terms of Title 69 O.S. 1951 § 48, which provides that the State Highway Commission shall let all contracts for construction work upon the state highway system to the lowest responsible bidder after notice of publication is issued under the terms and conditions of the statute. In the statute is a provision that the statute shall apply "with equal force to the county commissioners of the various counties, in all matters pertaining to the county highways." However, the information in this case expressly charged a violation of a specific statute, Title 69 O.S. 1951 § 323. Nowhere in this statute nor in any other statute called to our attention is there a specific mandate from the Legislature requiring advertisement for bids for repairs to be made on the county highway system.

It is the duty of the Legislature to determine the policy of the state to be voiced in statutory enactments. Legislative power, not wisdom, is the concern of the courts. Ex parte Strauch, 80 Okla. Cr. 89, 157 P. 2d 201.

As hereinabove observed, the section of the statute under which the prosecution was instituted is negative in its nature and merely states that nothing in the statute could be construed to prevent the purchase "without advertisement" of a certain class of material where the cost in any one purchase is less than $1,000. Nowhere is it stated that if the cost is greater than $1,000 advertisement should be made to prospective bidders.

The information charges that the defendant and his codefendants did violate Title 69 O.S. 1951 § 323 by purchasing asphaltic concrete in the amount of $6,846.28 "without having first advertised and considered bids for such asphaltic concrete," and "such purchase was used * * * for repairing of a county highway."

It may have been that the county attorney, if he had chosen to do so, could have presented facts which would have sustained a prosecution under the first section of the statute involved, which has been hereinabove discussed, but in order to have maintained the prosecution under that section of the statute which specifically required advertisement for bids, the county attorney in his proof would have had to show that the engineer had prepared plans and specifications for the repairs in accordance with statutory minimum restrictions or state and federal requirements and that the estimated cost for material and construction was $2,500 or more. The cost here certainly exceeded $2,500, but there was no proof that the county engineer had made a survey of the project and had prepared plans and specifications or had made an estimate of the cost of the material to be used as a part of state or federal requirements.

There is another reason why this prosecution must fail. The statute authorizes the purchase of certain material, namely "crushed rock, gravel, sand, cement, steel, lumber or other materials * * * commonly bought in bulk." In this case the proof showed a contract for the delivery of asphaltic concrete laid in place on the Sooner Road.

The testimony of the president of the paving company, who testified for the state, was undisputed. He said that the claims filed by the paving company for the Sooner Road work embodied three elements, to-wit: (1) the cost of the material, (2) the hauling of the material to the county highway, and (3) the cost of the hand labor or machinery to lay the concrete in place. He further testified that in small patches where it was more convenient, hand labor was used to roll the hot asphaltic concrete in place and the charge in that instance was $12 per ton, but that in the large areas of repair work where the asphaltic concrete was laid in place by machinery $8.04 per ton was charged. The state's evidence does not

break down these items so that this court could determine the cost of the material which was furnished, as the claims called for the payment not only for material, but for hauling and the use of hand labor or machinery in connection with the laying of the concrete in place.

In Oklahoma there are no common-law crimes and no act is a crime unless it is made so by statute. In this connection it is established law that penal statutes are to be interpreted strictly against the state and liberally in favor of the accused, and words not found in the text of a criminal statute will not be read in for the purpose of extending it or giving it an interpretation in conformity with a supposed policy. State v. Stegall, 96 Okla. Cr. 281, 253 P. 2d 183; Delano v. State, 82 Okla. Cr. 258, 168 P. 2d 659.

It is also established law that a legislative enactment creating an offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. Connally v. General Construction Company, 269 U.S. 385, 46 S. Ct. 126, 70 L. Ed. 322; Jones v. Eads, 97 Okla. Cr. 225, 261 P. 2d 633.

The difficulties in the disposition of this case arise from the fact that we are dealing with the fiscal affairs of a municipality and many restrictions have been placed around the handling of public funds. These restrictions are for the protection of the people and should be so construed as to effect their purpose. However, in the instant case, before this court would be justified in upholding the conviction, we would have to read into the statute words which do not therein appear. If the defendants had come within the terms of the statute, they could not have avoided their liability by the splitting of claims. Such practice would be contrary to both the spirit and the letter of the law. The statute specifically relates to purchases of material where the cost "in any one purchase is less than One Thousand Dollars ($1,000.00)." If the purchase is at one time for one purpose, the statute could not have been avoided by splitting the claims so that the amount of each claim would be less than $1,000. However, even though the commissioners thought that their purchase of asphaltic concrete laid in place was prohibited by the statute, unless advertisement for bids was made, still it is clear from what has been hereinabove stated that it was not within the contemplation of the statute.

If it was intended that purchases over $1,000 should be made only after advertisement, the statute should have so provided. Nowhere in the statute is there a statement that materials of a class purchased by the county commissioners for a certain purpose in excess of $1,000 must be by a certain method. The statute merely states, "nothing in this Section shall be construed to prevent the purchase, without advertisement * * *."

For this court to uphold the contention that under the statute the commissioners would have to advertise if they decided to purchase materials of a designated class where the cost is more than $1,000 and is not based upon an engineer's estimate in conformity with minimum restrictions or state or federal requirements as provided in the first paragraph of section 323, supra, they would not know how to proceed, as the statute is silent as to any method of advertisement, whether by publishing notice in a newspaper, by writing letters to prospective bidders, or by posting notices in public places, or by any other method of advertising or informing the public of the proposed purchases.

The above and foregoing conclusions we have reached effectively dispose of this case. However, we feel constrained to state that the third assignment of error

may not be sustained under the authority of State v. McCalla, 97 Okla. Cr. 3, 256 P. 2d 186, wherein we held that the Legislature may amend a section of a statute without re-enacting the entire statute, and that the act as amended merely changed the provision of the section which was amended and did not, by failure to re-enact other sections of the same code, operate to repeal such sections.

The judgment and sentence of the district court of Oklahoma county is reversed.

POWELL, P. J., and BRETT, J., concur.